Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Allison N. Stapleton, Esq.
Phil Nash, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE COMPANY, GEICO INDEMNITY COMPANY, GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY COMPANY, | Docket No.:_____ (      ) |
| Plaintiffs, | |
| -against- | **Plaintiff Demands a Trial by Jury** |
| KARIN GEPP, PH.D. (A Sole Proprietorship), GEPP PSYCHOLOGICAL SERVICES, PLLC, KARIN GEPP, JOHN DOE DEFENDANTS "1" through "10", ORLEIDA MATOS, JESSICA PAULIN, JASNETH MITCHELL, TREVOR PALMER, JOCELYN CACERES, ADINA HASANOVIC, MICKAELLE DOUGHERTY, AND TERESA WELLS | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## <u>COMPLAINT</u>

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"),

as and for their Complaint against Defendants, hereby alleges as follows:

## NATURE OF THE ACTION

1.     This action seeks to recover more than $1,100,000.00 that the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, hundreds of fraudulent unlawful and otherwise non-reimbursable no-fault insurance charges for purported psychology services, including diagnostic interviews and psychological testing (the "Fraudulent Services"), that purportedly were provided to individuals who claimed to have been involved in automobile accidents and were eligible for coverage under GEICO no-fault insurance policies ("Insureds").

2.     In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $320,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of Karin Gepp, Ph.D. ("Gepp Sole Proprietorship") and Gepp Psychological Services, PLLC ("Gepp Psych") because:

(i)     the Defendants were not in compliance with all material laws and regulations governing healthcare practices and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)     the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)     the Fraudulent Services were not medically or psychologically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)     in many cases, the Fraudulent Services never were provided in the first instance; and

(v)     the billing codes used by the Defendants for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

3.     Specifically, the fraudulent scheme can be described as follows:

(i)     Karin Gepp ("Dr. Gepp") and John Doe Defendants "1" through "10" through unlawful financial arrangements, established relationships with a large number of multidisciplinary clinics located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (hereinafter, the "Clinics");

(ii)    Dr. Gepp and John Doe Defendants "1" through "10"  arranged to have the Fraudulent Services performed by social workers and other unlicensed individuals by the names of Orleida Matos, Jessica Paulin, Jasneth Mitchell, Trevor Palmer, Jocelyn Caceres, Adina Hasanovic, Mickaelle Dougherty and Teresa Wells (collectively, referred to hereinafter as the "Social Worker Defendants") at the Clinics, consisting of  more than thirty (30) separate locations during a period of less than nine (9) months, and generate falsified reports regarding the scope of the services and the clinical findings; and

(iii)   Dr. Gepp and John Doe Defendants "1" through "10" unlawfully used the falsified reports to submit bills for thousands of dollars per patient per date of treatment to GEICO and other New York automobile insurance companies, seeking payment for the performance of the Fraudulent Services under two separate entities: (a) Gepp Sole Proprietorship, and (b) Gepp Psych (collectively, the "Gepp Entities"), using two separate Tax Identification Numbers ("TIN"): (a) TIN No.: 853649455; and (b) TIN No.: 861900382.

4.     As set forth herein, the Defendants at all relevant times have known that:

(i)     the Defendants were not in compliance with all material laws and regulations governing healthcare practices and/or licensing laws and, as a result, were not eligible to receive no-fault reimbursement in the first instance;

(ii)    the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice and/or licensing laws and, therefore, were not eligible for no-fault reimbursement in the first instance;

(iii)   the Fraudulent Services were not medically or psychologically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(vi)    in many cases, the Fraudulent Services never were provided in the first instance; and

(vii)   the billing codes used by the Defendants for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

5.      As such, the Defendants are not and have never been eligible to be compensated for the bills they have submitted through the Gepp Entities to GEICO.

6.      The charts annexed hereto as Exhibit "1" and Exhibit "2" summarize, in part, the fraudulent charges identified to date that the Defendants have submitted, or caused to be submitted, to GEICO, using the United States mails, for the Gepp Sole Proprietorship and Gepp Psych, respectively.

7.      The Defendants' fraudulent scheme began no later than the year 2020 and has continued uninterrupted since that time.

8.      As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $1,100,000.00.

## THE PARTIES

### I.    Plaintiffs

9.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   Defendants

10.     Defendant Dr. Gepp resides in and is a citizen of New York. At all relevant times Dr. Gepp was a registered clinical psychologist who purported to provide many of the Fraudulent Services that were billed to GEICO through the Gepp Entities in her name.

11.     Defendants, Orleida Matos ("Matos"), Jessica Paulin, ("Paulin"), Trevor Palmer, ("Palmer"), Jasneth Mitchell ("Mitchell"), Jocelyn Caceres ("Caceres"), Mickaelle Dougherty ("Dougherty"), and Adina Hasanovic ("Hasanovic") all reside in and are citizens of New York. Defendant Teresa Wells ("Wells") resides in and is a citizen of the State of Georgia but resided in New York at the time that the events described in this complaint transpired. At all relevant times, Matos, Paulin, Palmer, Mitchell, Caceres, Hasanovic, Dougherty, and Wells were social workers and/or unlicensed persons who purported to provide many of the Fraudulent Services that were billed to GEICO through the Gepp Entities.

12.     Matos, Paulin and Mitchell are no strangers to these types of fraudulent no-fault insurance schemes as each were directly involved in a related scheme involving a clinical psychologist by the name of Dianna Bruno, whose identity and license and sole proprietorship was misappropriated by laypersons and wrongfully used to bill GEICO for more than $1 million during the same time frame that the present scheme was taking place.

13.     John Doe Defendants "1" through "10" are citizens of New York. John Doe Defendants "1" through "10" are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with Dr. Gepp, the Gepp Entities and the Social Worker Defendants.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

15.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

16.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

17.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

18.     GEICO underwrites automobile insurance in New York.

## I.     An Overview of the Pertinent Law Governing No-Fault Reimbursement

19.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

20.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses incurred for health care goods and services, including medical services.

21.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

22.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the

claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").  In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

23.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

24.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ….  (Emphasis added).

25.     In New York, only a licensed psychologist may: (i) practice psychology; (ii) own or control a psychology practice; (iii) employ and supervise other psychologists; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

26.     Unlicensed non-psychologists may not: (i) practice psychology; (ii) own or control a psychology professional corporation; (iii) employ and supervise other psychologists; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from psychologist services.

27.     New York law prohibits licensed healthcare services providers, including psychologists, from paying or accepting kickbacks in exchange for patient referrals.  See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

28.     New York law prohibits unlicensed persons not authorized to practice a profession, like psychology, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

29.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or it allows unlicensed laypersons to share in the fees for the professional services.

30.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed practitioners may practice their profession in New York because of the concern that unlicensed persons are not bound by "ethical rules" that govern the quality of care.

31.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

32.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

33.     In New York, claims for PIP Benefits are governed by the New York Workers'
Compensation Fee Schedule (the "NY Fee Schedule").

34.     When a healthcare services provider submits a claim for PIP Benefits using the
current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that:
(i) the service described by the specific CPT code that is used was performed in a competent manner
in accordance with applicable laws and regulations; (ii) the service described by the specific CPT
code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee
were not excessive.

35.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms
submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified
by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or
> other person files an application for insurance or statement of claim containing any
> materially false information, or conceals for the purpose of misleading, information
> concerning any fact material thereto, commits a fraudulent insurance act, which is a
> crime.

## II.     The Defendants' Fraudulent Scheme

36.     Beginning in 2020 and continuing through the present, the Defendants
masterminded and implemented a complex fraudulent scheme in which the Gepp Entities have
been used in succession and interchangeably to bill GEICO more than $1,600,000.00 for medically
and psychologically unnecessary, illusory, and otherwise non-reimbursable psychology services,
all in less than nine (9) months.  In fact, the Gepp Sole Proprietorship billed GEICO more than
$727,000.00 for the Fraudulent Services allegedly provided between mid-October of 2020 and the
end of March 2021 (less than 6 months), and Gepp Psych was formed in New York on February
1, 2021, and then proceeded to bill GEICO more than $926,000.00 for Fraudulent Services

allegedly provided from the beginning of March 2021 through the Middle of July 2021 (4 ½ months).   The use of those "entities" was thereafter abandoned in July of 2021, without explanation.

37.    Beyond the sheer absurdity regarding the volume of billing in the relevant time frame, had the Gepp Entities had been formed and operated to provide and bill for legitimate services to Insureds, rather than to avoid detection by insurance companies, there would be no reason to alternate or terminate the use of the two (2) billing entities. By way of example, the billing submitted by the Gepp Entities indicates that the Gepp Entities were simultaneously treating Insureds at the same location and at multiple different locations for a period of more than three weeks:

| Date | Locations (Gepp Sole Proprietorship) | Patients (Gepp Sole Proprietorship) | Locations Gepp Psych) | Patients (Gepp Psych) |
|---|---|---|---|---|
| | | | | |
| March 2, 2021 | 1122 Coney Island Avenue, 1894 Eastchester Road | 5 | 1894 Eastchester Road, 1 Fulton Avenue | 3 |
| | | | | |
| March 9, 2021 | 1122 Coney Island Avenue, 1894 Eastchester Road and 3910 Church Avenue | 6 | 1894 Eastchester Road and 3910 Church Avenue | 7 |
| | | | | |
| March 17, 2021 | 3041 Avenue U, 20412 Hillside Avenue | 7 | 3041 Avenue U, 20412 Hillside Avenue, 3910 Church Street, | 11 |

### 1.    <u>Gaining Access to Insureds</u>

38.    The Gepp Entities had no legitimate indicia.  They had no fixed treatment locations of any kind, did not maintain stand-alone practices, were not the owners or leaseholders in the real property from which they purported to provide psychological services, did not employ their own support staff, and did not advertise or market their services to the general public.

39.     Rather, access to Insureds was obtained through the payment of kickbacks or other financial incentives by Dr. Gepp, the Gepp Entities and John Doe Defendants "1" through "10" to the owners/operators of more than thirty (30) clinics located throughout the New York metropolitan area that specialized in "treating" patients with no-fault insurance who claimed to have been injured in automobile accidents (the "Clinics"). These Clinics, include, but are not limited to the following locations:

| Clinic Location | | | Clinic Location | | |
|---|---|---|---|---|---|
| 3910 Church Avenue | Brooklyn | NY | 7945 Metropolitan Avenue | Flushing | NY |
| 1894 Eastchester Road | Bronx | NY | 1120 Morris Park Avenue | Bronx | NY |
| 1 Fulton Avenue | West Hempstead | NY | 2673 Atlantic Avenue | Brooklyn | NY |
| 1120 Morris Park Avenue | Bronx | NY | 1762 McDonald Avenue | Brooklyn | NY |
| 7945 Middle Village | Middle Village | NY | 89-25 130th Street | Richmond Hill | NY |
| 3041 Avenue U | Brooklyn | NY | 9714 Rockaway Boulevard | Ozone Park | NY |
| 20412 Hillside Avenue | Hollis | NY | 59-01 94th Street | Elmhurst | NY |
| 2598 Third Avenue | Bronx | NY | 3310 101st Street | Corona | NY |
| 2386 Jerome Avenue | Bronx | NY | 3432-05 East Tremont Avenue | Bronx | NY |
| 1122 Coney Island Avenue | Brooklyn | NY | 1314 Coney Island Avenue | Brooklyn | NY |
| 1735 Pilkin Avenue | Brooklyn | NY | 1786 Flatbush Avenue | Brooklyn | NY |
| 22201 Hempstead Avenue | Queens Village | NY | 409 Rockaway Avenue | Brooklyn | NY |
| 4226-A 3rd Avenue | Bronx | NY | 11605 Myrtle Avenue | Richmond Hill | NY |
| 10228 Jamaica Avenue | Queens | NY | 105-10 Flatlands Avenue | Brooklyn | NY |
| 152-80 Rockaway Boulevard | Jamaica | NY | 50-01 94th Street | Elmhurst | NY |

40.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

41.     The Clinics provided facilities for the Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

42.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.  In fact, many of the Clinics identified in this complaint are the same locations where other insurance fraud schemes involving fraudulent psychology treatment and billing practices took place during the same time frames, including similar fraudulent treatment and billing schemes involving (i) the misappropriation of the license, name and sole proprietorship involving Dianna Bruno Psy.D., LMHC, and (ii) a fraudulent billing and treatment scheme involving MW Psychology, P.C. ("MW Psych"), MWaldman Corporation ("MWaldman Corp"), and its purported owner, Mel Waldman, Ph.D.

43.     The Clinics willingly provided access to Dr. Gepp, the Gepp Entities and John Doe Defendants "1" through "10" in exchange for kickbacks because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to high volumes of Insureds at the locations.

44.     In general, the Referral Sources at the Clinics, including John Doe Defendants "1"-"10", were paid a sum of money by Dr. Gepp, the Gepp Entities and John Doe Defendants "1" through "10" Owner Defendants. Though the payments were typically disguised as "rent," they were, in reality, kickbacks for referrals, and the relationship between Dr. Gepp, the Gepp Entities and John Doe Defendants "1" through "10" and the Referral Sources, was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" to Dr. Gepp, Matos,

Paulin, Palmer, Mitchell, Caceres, Dougherty, Wells and Hasanovic (collectively the "Practitioner Defendants"), or some other mental health practitioner associated with the Gepp Entities who was purportedly present at the Clinic at that time, for psychological evaluation and testing, regardless of individual symptoms, presentation, or – in most cases – the total absence of any clinically significant psychological symptoms arising from any automobile accident.

45.     The Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to one of the Practitioner Defendants, who were given access to the Clinics' offices on a transient basis pursuant to the payments made by the Owner Defendants to the Referral Sources.

46.     The unlawful kickback and referral arrangements were essential to the success of Defendants' fraudulent scheme. The Defendants derived significant financial benefit from the relationships with the Referral Sources, because without access to the Insureds, the Defendants would not have had the ability to execute the fraudulent treatment and billing protocol and bill GEICO and other insurers.

47.     Dr. Gepp and John Doe Defendants "1" through "10" at all times knew that the kickbacks and referral arrangements were illegal and, therefore, took affirmative steps to conceal the existence of the fraudulent referral scheme.

48.     In fact, Dr. Gepp and John Doe Defendants "1" through "10" incorporated and operated each of the Gepp Entities for only a short period of time and in succession in an effort to try and limit the billing for the Fraudulent Services submitted to GEICO by any one of the Entity Defendants and to "stay under the radar" of GEICO and other New York automobile insurer.  In fact, the Entity Defendants were simply interchangeable and used responsively to insurance

companies' efforts to seek verification, examinations under oath and other information to try and verify the legitimacy of the services and eligibility of the Gepp Entities.

### 2.      The Fraudulent Treatment and Billing Protocol

49.     Every Insured who was seen by the Practitioner Defendants was subjected to a psychiatric evaluation, as well as to a virtually identical series of unnecessary psychological testing and services that were provided pursuant to a predetermined protocol.

50.     The Clinic "representatives" providing access and/or making the referrals were unlicensed individuals. Each step in the "treatment" protocol was designed to reinforce the rationale for the previous step and to justify the subsequent step, and thereby permit the generation of a maximum amount of no-fault billing for each Insured.  In fact, the battery of unnecessary psychological evaluation and psychological tests more fully described below were purportedly performed resulted in more than $1.6 million in billing to GEICO in approximately nine (9) months.

### A.      The Fraudulent Pre-Determined Treatment Protocol

51.     When an Insured was referred to the Practitioner Defendants pursuant to the unlawful referral arrangement, the Gepp Entities would systemically bill for the same combination of CPT codes with the following descriptions and charges:

(i)      "psychiatric diagnostic evaluation" under CPT code 90791 (1 unit), with a charge of $254.78;

(ii)     "neurobehavioral status exam" under CPT code 96116 (1 unit), with a charge of $270.06;

(iii)    "psychological testing by psych/phys" under CPT code 96101 (4 units), with a charge of $967.08; and

(iv)     "neuropsychological test by psych/phys" under CPT code 96118 (2 units), with a charge of $583.52.

14

52.     In other words, the referral of the Insured to the Practitioner Defendants would typically result in an initial series of charges to GEICO by the Gepp Entities of more than $2,000.00 per Insured based on the Fraudulent Services.

53.     With respect to Gepp Psych, the billing was adjusted by falsely using a 1-B modifier in an attempt to even further inflate the charges for the Fraudulent Services, once again billing for the same combination of CPT codes:

     (i)     "psychiatric diagnostic evaluation" under CPT code 90791-1B (1 unit), with a charge of $305.73;

     (ii)     "psychological testing by psych/phys" under CPT code 96101-1B (4 units), with a charge of $1,160.48;

     (iii)     "neurobiological status exam" under CPT code 96117-1B (1 unit), with a charge of $324.07; and

     (iv)     "neuropsychological testing by psych/phys" under CPT code 96118-1B (2 units), with a charge of $700.22.

54.     In other words, the amounts originally being billed by the Defendants for the Fraudulent Services was not sufficient so they had to find a way to "enhance" them by further manipulating to the billing and associated CPT Codes.

55.     Despite the purported symptoms or lack of symptoms noted for each Insured, virtually every patient received the same treatment and was billed for same. For example:

     (i)     On October 28, 2020, an Insured named JS was purportedly involved in a motor vehicle accident. On December 1, 2020, JS purported underwent an initial evaluation with Matos at the Clinic located at 1 Fulton Avenue, West Hempstead, New York (the "Fulton Avenue Clinic"). The notes from the purported evaluation indicate that JS reported that his symptoms included, "nervousness, dizziness, trouble with recollection, insomnia, hypervigilance, body feeling weak". After this purported evaluation, a bill was submitted to GEICO under the Gepp Sole Proprietorship, purportedly for services provided by Dr. Gepp, for the following: (i) "psych diagnostic evaluation" under CPT code 90791 (1 unit), with a charge of $254.78; (ii) "neurobehavioral status exam" under CPT code 96116 (1 unit), with a charge of $270.06; (iii) "psycho testing by psych/phys" under CPT code 96101 (4 units), with a charge of $967.08; and (iv) "neuropsych test by psych/phys" under CPT code 96118 (2 units), with a charge of $583.52.

(ii)     On November 10, 2020, an Insured named JR was purportedly involved in a motor vehicle accident. JR purportedly underwent an initial evaluation with Matos on December 2, 2020, at the Clinic located at 3041 Avenue U, Brooklyn, New York (the "Avenue U" Clinic). The notes from the purported evaluation indicate that JR did not report any symptoms. After the purported evaluation, a bill was submitted to GEICO under the Gepp Sole Proprietorship, purportedly for services provided by Dr. Gepp, for the following: (i) "psych diagnostic evaluation" under CPT code 90791 (1 unit), with a charge of $254.78; (ii) "neurobehavioral status exam" under CPT code 96116 (1 unit), with a charge of $270.06; (iii) "psycho testing by psych/phys" under CPT code 96101 (4 units), with a charge of $967.08; and (iv) "neuropsych test by psych/phys" under CPT code 96118 (2 units), with a charge of $583.52.

(iii)    On February 1, 2021, an Insured named EC was purportedly involved in a motor vehicle accident. EC purportedly underwent an initial evaluation with Palmer on April 2, 2021 at the Clinic located at 1762 McDonald Avenue, Brooklyn, New York (the "McDonald Avenue Clinic"). The notes from the purported evaluation indicate that EC reported that his symptoms included "nervousness, internal tremors, and easy agitation". After the purported evaluation, a bill was submitted to GEICO under Gepp Psych, purportedly for services provided by Dr. Gepp, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing by psych/phys" under CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobiological status exam" under CPT code 96117-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" under CPT code 96118-1B (2 units), with a charge of $700.22.

(iv)     On February 24, 2021, an Insured named JC was purportedly involved in a motor vehicle accident. JC purportedly underwent an initial evaluation with Mitchell on April 9, 2021 at the Clinic located at 1735 Pitkin Avenue, Brooklyn, New York (the "Pitkin Avenue Clinic"). The notes from the purported evaluation indicate that JC did not report any symptoms. After the purported evaluation, a bill was submitted to GEICO under Gepp Psych, purportedly for services provided by Dr. Gepp, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing by psych/phys" under CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobiological status exam" under CPT code 96117-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" under CPT code 96118-1B (2 units), with a charge of $700.22.

(v)      On June 11, 2021, an Insured named RR was purportedly involved in a motor vehicle accident. RR purportedly underwent an initial evaluation with Mitchell on June 18, 2021 at the Pitkin Avenue Clinic. The notes from the purported evaluation indicate that RR did not report any symptoms. After the purported evaluation, a bill was submitted to GEICO under Gepp Psych, purportedly for services provided

by Dr. Gepp, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing by psych/phys" under CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobiological status exam" under CPT code 96117-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" under CPT code 96118-1B (2 units), with a charge of $700.22.

56.     In keeping with the fact that the pre-determined treatment protocol utilized by Dr. Gepp, the Gepp Entities and John Does "1" through "10" to fraudulently bill GEICO for treatment and testing that was either unnecessary or never occurred, on multiple occasions, Insureds who were purportedly involved in the same motor vehicle accident received the same treatment and recommendations, regardless of their reported symptoms and diagnosis. For example:

(i)     On October 10, 2020, an Insured named KH was purportedly involved in a motor vehicle accident. On November 3, 2020, KH purportedly underwent an initial evaluation with Matos at the Fulton Avenue Clinic. The notes from the purported evaluation indicate that KH reported his symptoms to include "nervousness". Matos diagnosed KH with an "adjustment disorder" and recommended that "patient should complete the neuropsychological evaluation. Patient should start psychotherapy at least once a week to achieve tools to cope with disabilities. Patient should receive cognitive remediation as needed." After the purported evaluation, a bill was submitted to GEICO under the Gepp Sole Proprietorship, purportedly for services provided by Dr. Gepp, for the following: (i) "psych diagnostic evaluation" under CPT code 90791 (1 unit), with a charge of $254.78; (ii) "neurobehavioral status exam" under CPT code 96116 (1 unit), with a charge of $270.06; (iii) "psycho testing by psych/phys" under CPT code 96101 (4 units), with a charge of $967.08; and (iv) "neuropsych test by psych/phys" under CPT code 96118 (2 units), with a charge of $583.52.

(ii)    On October 10, 2020, an Insured named LH was purportedly involved in the same motor vehicle accident as KH. On November 10, 2020, LH purportedly underwent an initial evaluation with Matos at the Fulton Avenue Clinic. The notes from the purported evaluation indicate that LH reported her symptoms to include "chest pain, trouble with recollection, insomnia". Matos diagnosed LH with an "adjustment disorder with anxiety" and recommended "supportive psychotherapy through cognitive-behavior therapy and/or biofeedback". After the purported evaluation, a bill was submitted to GEICO under the Gepp Sole Proprietorship, purportedly for services provided by Dr. Gepp, for the following: (i) "psych diagnostic evaluation" under CPT code 90791 (1 unit), with a charge of $254.78; (ii) "neurobehavioral status exam" under CPT code 96116 (1 unit), with a charge of $270.06; (iii) "psycho testing by psych/phys" under CPT code 96101 (4 units),

with a charge of $967.08; and (iv) "neuropsych test by psych/phys" under CPT code 96118 (2 units), with a charge of $583.52.

(iii)     On October 22, 2020, an Insured named TP was purportedly a passenger involved in a motor vehicle accident. On January 18, 2021, TP purportedly underwent an initial evaluation with Paulin at the Clinic located a 79-45 Metropolitan Avenue, Middle Village, New York (the "Metropolitan Avenue Clinic"). The notes from the purported evaluation indicate that TP reported his symptoms to include "weakness, short term memory loss, dizziness". Paulin diagnosed TP with "pain disorder with psychological factors" and gave the recommendation of "supportive psychotherapy through cognitive-behavior therapy and/or biofeedback". After this purported evaluation, a bill was submitted to GEICO under the Gepp Sole Proprietorship, purportedly for services provided by Dr. Gepp, for the following: (i) "psych diagnostic evaluation" under CPT code 90791 (1 unit), with a charge of $254.78; (ii) "neurobehavioral status exam" under CPT code 96116 (1 unit), with a charge of $270.06; (iii) "psycho testing by psych/phys" under CPT code 96101 (4 units), with a charge of $967.08; and (iv) "neuropsych test by psych/phys" under CPT code 96118 (2 units), with a charge of $583.52.

(iv)     On October 22, 2020, an Insured named THP was purportedly a driver involved in the same motor vehicle accident as TP. THP purportedly underwent an initial evaluation with Paulin at the Metropolitan Avenue Clinic on the same day as TP, January 18, 2021. The notes from the purported evaluation indicate that THP did not report any symptoms. Despite this, Paulin also diagnosed THP with "pain disorder with psychological factors" and gave the recommendation of "supportive psychotherapy through cognitive-behavior therapy and/or biofeedback". After this purported evaluation, a bill was submitted to GEICO under the Gepp Sole Proprietorship, purportedly for services provided by Dr. Gepp, for the following: (i) "psych diagnostic evaluation" under CPT code 90791 (1 unit), with a charge of $254.78; (ii) "neurobehavioral status exam" under CPT code 96116 (1 unit), with a charge of $270.06; (iii) "psycho testing by psych/phys" under CPT code 96101 (4 units), with a charge of $967.08; and (iv) "neuropsych test by psych/phys" under CPT code 96118 (2 units), with a charge of $583.52.

(v)     On November 22, 2020, an Insured named JP was purportedly a passenger involved in a motor vehicle accident. JP purportedly underwent an initial examination with Paulin at the Metropolitan Avenue Clinic on December 2, 2020. The notes from the purported evaluation indicate that JP reported his symptoms to include "trouble sleeping and eating and feels nervous, weak and tense". Paulin diagnosed JP with "pain disorder with psychological factors" and gave the recommendation that "patient should complete the neuropsychological evaluation. Patient should start psychotherapy at least once a week to achieve tools to cope with disabilities. Patient should receive cognitive remediation as needed." After the purported evaluation, a bill was submitted to GEICO under

the Gepp Sole Proprietorship, purportedly for services provided by Dr. Gepp, for the following: (i) "psych diagnostic evaluation" under CPT code 90791 (1 unit), with a charge of $254.78; (ii) "neurobehavioral status exam" under CPT code 96116 (1 unit), with a charge of $270.06; (iii) "psycho testing by psych/phys" under CPT code 96101 (4 units), with a charge of $967.08; and (iv) "neuropsych test by psych/phys" under CPT code 96118 (2 units), with a charge of $583.52.

(vi)     On November 22, 2020, an Insured named HR was purportedly a driver involved in the same motor vehicle accident as JP. HR purportedly underwent an initial evaluation on December 2, 2020 at the Metropolitan Avenue Clinic with Paulin, the same day as JP. The notes from the purported evaluation indicate that HR reported his symptoms to include that he "believes most people can't be trusted". Paulin also diagnosed HR with "pain disorder with psychological factors" and gave the recommendation that "patient should complete the neuropsychological evaluation. Patient should start psychotherapy at least once a week to achieve tools to cope with disabilities. Patient should receive cognitive remediation as needed." After the purported evaluation, a bill was submitted to GEICO under the Gepp Sole Proprietorship, purportedly for services provided by Dr. Gepp, for the following: (i) "psych diagnostic evaluation" under CPT code 90791 (1 unit), with a charge of $254.78; (ii) "neurobehavioral status exam" under CPT code 96116 (1 unit), with a charge of $270.06; (iii) "psycho testing by psych/phys" under CPT code 96101 (4 units), with a charge of $967.08; and (iv) "neuropsych test by psych/phys" under CPT code 96118 (2 units), with a charge of $583.52.

(vii)    On March 11, 2021, an Insured named DP was purportedly involved in a motor vehicle accident. DP purportedly underwent an initial evaluation at the Pitkin Avenue Clinic with Mitchell on April 2, 2021. The notes from the purported initial evaluation indicate that DP did not report any symptoms. Despite this, Mitchell diagnosed DP with a "pain disorder with psychological factors" and recommended "supportive psychotherapy through cognitive-behavioral therapy and/or biofeedback." After the purported evaluation, a bill was submitted to GEICO under Gepp Psych, purportedly for services provided by Dr. Gepp, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing by psych/phys" under CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobiological status exam" under CPT code 96117-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" under CPT code 96118-1B (2 units), with a charge of $700.22.

(viii)   On March 11, 2021, an Insured named MC was purportedly involved in the same motor vehicle accident as DP. MC purportedly underwent an initial evaluation at the Pitkin Avenue Clinic with Mitchell on the same day as DP, April 2, 2021. The notes from the purported initial evaluation indicate that MC did not report any symptoms. Again, despite this, Mitchell also diagnosed MC

with "pain disorder with psychological factors" and recommended "supportive psychotherapy through cognitive-behavioral therapy and/or biofeedback." After the purported evaluation, a bill was submitted to GEICO under Gepp Psych, purportedly for services provided by Dr. Gepp, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing by psych/phys" under CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobiological status exam" under CPT code 96117-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" under CPT code 96118-1B (2 units), with a charge of $700.22.

(ix)    On March 18, 2021, an Insured named JD was purportedly involved in a motor vehicle accident. JD purportedly underwent an initial evaluation at the Avenue U Clinic with Hasanovic on March 31, 2021. The notes from the purported initial evaluation indicate that JD reported his symptoms to include "nervousness, shakiness inside, faintness". Hasanovic diagnosed JD with an "adjustment disorder with mixed anxiety and depressed mood" and recommended "supportive psychotherapy through cognitive-behavioral therapy and/or biofeedback." After the purported evaluation, a bill was submitted to GEICO under Gepp Psych, purportedly for services provided by Dr. Gepp, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing by psych/phys" under CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobiological status exam" under CPT code 96117-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" under CPT code 96118-1B (2 units), with a charge of $700.22.

(x)    On March 18, 2021, an Insured named CF was purportedly involved in the same motor vehicle accident as JD. CF purportedly underwent an initial evaluation at the Avenue U Clinic with Hasnovic on the same day as JD, March 31. 2021. The notes from the purported initial evaluation indicate that CF reported her symptoms to include "nervousness, shakiness inside, faintness", the same symptoms as JD. Hasanovic also diagnosed CF with an "adjustment disorder with mixed anxiety and depressed mood" and recommended "supportive psychotherapy through cognitive-behavioral therapy and/or biofeedback." After the purported evaluation, a bill was submitted to GEICO under Gepp Psych, purportedly for services provided by Dr. Gepp, for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing by psych/phys" under CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobiological status exam" under CPT code 96117-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" under CPT code 96118-1B (2 units), with a charge of $700.22.

**B.    The Fraudulent Diagnostic Interview Examinations and Charges**

57.     Once an Insured was referred to one of the Practitioner Defendants or some other mental health practitioner associated with the Gepp Entities pursuant to the unlawful referral, the Practitioner Defendants or other mental health practitioner initially purported to conduct a diagnostic evaluation.

58.     The diagnostic evaluation was then billed to GEICO in the name of the Gepp Sole Proprietorship using CPT code 90791 and a resulting charge of $254.78, or in the name of Gepp Psych using CPT code 90791-1B and a resulting charge of $305.73.   These charges were separate and independent of the other Fraudulent Services that the Insured purportedly received. The diagnostic interview examinations were fraudulent, to the extent they were conducted at all, because: (i) they were psychologically unnecessary; (ii) conducted pursuant to the improper financial arrangements between the Defendants and the Clinics and not pursuant to the documented and clinically reasonable needs of the Insureds; and (iii) were purportedly conducted by Dr. Gepp, which virtually never actually happened.   In addition, in the claims for diagnostic evaluations identified in Exhibits "1"-"2", the bills and supporting documents falsely represented that they were legitimately performed in the first instance.

### a.     Basic, Legitimate Psychiatric Diagnostic Evaluations

59.     A psychiatric diagnostic evaluation is an integrated assessment whereby a mental health practitioner elicits patient data and then uses that data to establish a preliminary diagnosis and, if necessary, to formulate an individualized treatment plan for that patient.

60.     In a legitimate clinical setting, during a psychiatric diagnostic evaluation, the data necessary to derive a preliminary diagnosis and, if necessary, to formulate an individualized treatment plan for a patient, is elicited through a clinical interview and a mental status examination.

61.    The clinical interview is a face-to-face encounter between the mental health practitioner and patient during which the practitioner observes the patient and elicits information regarding the patient's chief complaint, medical history, psychiatric history, family history, and social history.

62.    The mental status examination is a structured assessment of the patient's behavioral and cognitive functioning. It includes descriptions of the patient's appearance and general behavior, level of consciousness and attentiveness, motor and speech activity, mood and affect, thought and perception, attitude, insight and judgment, orientation, attention, concentration and other cognitive areas. Typically, some components of the mental status examination are obtained through observation and other components are obtained through questioning of the patient.

63.    In non-complex cases, a psychiatric diagnostic evaluation consisting of a clinical interview and a mental status examination will typically elicit patient data sufficient to establish a preliminary diagnosis and, if necessary, to formulate an individualized treatment plan for that patient. In an atypical or complex case, where a mental health practitioner is unable to establish a preliminary diagnosis based on a patient interview and a mental status examination, that mental health practitioner may choose to incorporate simple self-administered or self-scored inventories, screening tests, or other similar tests as part of the psychiatric diagnostic evaluation. The use of these simple types of inventories/tests are considered part of the evaluation service and are not separately payable as psychiatric testing.

**b.    The Medically Unnecessary Diagnostic Evaluations**

64.    In the claims identified in Exhibits "1" and "2", virtually none of the Insureds suffered clinically significant psychiatric symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary.

65.     In a legitimate clinical setting, a psychiatric diagnostic evaluation is medically necessary when a patient has a psychiatric illness and/or is demonstrating emotional or behavioral symptoms which manifest in inappropriate behavior patterns or maladaptive functioning in personal or social settings, when a patient's baseline functioning is altered by suspected illness or symptoms, or when a patient exhibits a sudden change in behavior.

66.     In keeping with the fact that in the claims identified in Exhibits "1" and "2", virtually none of the Insureds suffered clinically significant psychiatric symptoms as a result of an underlying automobile accident such that a psychiatric diagnostic evaluation was medically necessary, nearly all of the Insureds whom the Defendants purported to treat were involved in very minor, "fender–bender" accidents.

67.     For example, in many of the claims identified in Exhibits "1" and "2", contemporaneous police reports indicated that the Insureds' accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents or injured at all.  In addition, in many of the claims identified in Exhibit "1" and "2", the Insureds did not seek treatment at any hospital as the result of their accidents, and virtually all of the Insureds who did go to the hospital were briefly observed in the emergency room and then released after a few hours, typically with nothing more serious than a soft tissue injury diagnosis.

68.     It is highly improbable that these trivial "fender-benders" – which virtually never resulted in serious physical injury – would have caused clinically significant psychiatric symptoms in any of the Insureds who purportedly experienced them, much less in multiple Insureds who happened to show up – without appointments – at one of the Clinics on the same day as one of the Entity Defendants.

69.     The Practitioner Defendants purported to provide the diagnostic evaluations in order to establish "clinical support" for the charges that they submitted under CPT code 90719, as well as to establish "clinical support" for additional Fraudulent Services that they purported to provide to the Insureds, including "psychiatric testing".  In fact, the charges that the Practitioner Defendants submitted through the Entity Defendants for the purported psychiatric diagnostic evaluations falsely represented that the evaluations were legitimately performed in the first instance.

70.     In fact, legitimate clinical interviews and mental status examinations were never performed and the Practitioner Defendants simply used a series of "templated" questionnaires and forms that were limited in scope not intended to have any legitimate benefit for the Insureds that were subjected to them, and conducted in order to establish a basis for the additional Fraudulent Services to which the Practitioner Defendants purported to subject the Insureds, including "psychiatric testing", as well as to establish a basis for other medically unnecessary healthcare services that the Referral Sources could purport to provide to the Insureds.

71.     For example, irrespective of any data elicited through the putative clinical interview and mental status examination of any particular Insured, the diagnostic examination reports submitted in support of the billing for virtually every Insured, always reported a boilerplate "diagnosis" as the result of "emotional and behavioral problems" incurred during an automobile accident. Additionally. virtually every diagnostic interview examination report submitted to GEICO by the Defendants contained language that was duplicated across all other reports. Only the Insureds' respective background information was unique to any particular patient. In almost every case, the "Recommendations" section consisted of boilerplate language that simply was cut-and-pasted between reports, generally reaching the following conclusions:

> **Impressions:** (Name of Insured) is suffering mainly from emotional and behavioral problems in addition to physical outcomes of the accident.
>
> **Recommendations**: (Name of Insured) should receive Supportive Psychotherapy through Cognitive-Behavioral Therapy and/or Biofeedback.  Treatment should be provided at least once a week to cope with disability and regulate pain levels; or
>
> **Recommendations**: Patient should complete the neuropsychological evaluation. Patient should start psychotherapy at least once a week in order to achieve tools to cope with disabilities. Patient should receive cognitive remediation as needed.

(A representative sample of the Defendants diagnostic interview examination "reports" containing this identical, boilerplate language is annexed hereto as Exhibit "3").

72.     In generating the reports, the Practitioner Defendants drew from a "stock" of language that they randomly assembled and combined with the Insureds' claim information to create the impression that the "psychiatric diagnostic evaluation" was actually and properly performed. In fact, they either were not performed at all, or were not meant to have any legitimate benefit for the Insureds that were subjected to them and were only conducted for the financial benefit of the Defendants.  Not only did the Defendants submit improper billing for the psychiatric diagnostic evaluations, they also "unbundled" the charges in virtually every instance in order to maximize the billing they could submit, or cause to be submitted, to GEICO.

73.     For instance, for virtually every Insured, the reports included statements from the Insured who was purportedly interviewed as a part of the psychological evaluation. Numerous Insureds reported the same symptoms, all purportedly describing these symptoms as "nervousness and shakiness inside." Many Insureds further described being "shocked from adrenaline." This "stock language" was utilized throughout various claim submissions to GEICO.

### C.     The Fraudulent "Psychological Testing" Charges

74.     On the same day that Insureds in the claims identified in Exhibits "1" and "2" were purportedly subjected to a diagnostic evaluation, the Practitioner Defendants purported to provide those same Insureds with a battery of needless psychological tests.

75.     Dr. Gepp, the Gepp Entities and John Doe Defendants "1" through "10" then caused the psychological testing to be billed to GEICO under CPT code 96101, systemically billing for 4 hours of testing at a rate of $241.77 per hour. This resulted in routine charges of $967.08 per round of testing per Insured.  With respect to Gepp Psych, as discussed in further detail below, psychological testing was routinely billed at an even higher rate using the "1B" modifier, under CPT code 96101-1B, systemically billing for 4 hours of testing at a rate of $290.12. This resulted in routine charges of $1,160.48 per round of testing per Insured.

76.     The psychological testing was unnecessary, and conducted, to the extent it was conducted at all, pursuant to the improper financial arrangements between the Defendants and the Clinics.

77.     In keeping with the fact that the "psychiatric testing" was medically and psychologically unnecessary, the vast majority of Insureds did not suffer from any clinically significant psychiatric symptoms as a result of their putative "fender benders".  Even if any of the Insureds did suffer clinically significant psychiatric symptoms as a result of their putative accidents – which they did not – in a legitimate clinical setting, the diagnostic evaluation is typically the only service necessary to formulate a diagnosis and treatment plan for individual Insureds in non-complex psychological cases. Conversely, psychological testing is typically only indicated in complex psychological cases, and only where the particular testing administered is intended to

augment the findings from the initial clinical interview and mental status examination and to clarify a differential diagnosis.

78. In the claims for "psychiatric testing" that are identified in Exhibits "1" and "2", none of the Insureds who purportedly were subjected to "psychiatric testing" by the Practitioner Defendants presented with complex psychiatric symptoms. Rather, each Insured – to the extent that they suffered any clinically significant psychiatric symptoms at all as a result of their putative automobile accidents – experienced an obvious precipitant (i.e., the underlying automobile accident) and developed the supposed psychiatric symptoms in response to the accident. In straightforward, non-complex cases such as these, the clinical interview and mental status examination portions of the psychiatric diagnostic evaluation are generally sufficient mechanisms for gathering the patient data necessary to formulate an individualized diagnosis and treatment plan.

79. Furthermore, even if the Insureds presented to the Gepp Entities with complex psychiatric symptoms attributable to their minor automobile accidents – which they did not – the "psychiatric testing" that the Practitioner Defendants purported to provide to the Insureds would not have elicited any significant data that could not have been elicited during the clinical interview and mental status examination portions of a legitimate psychiatric diagnostic evaluation.

80. In addition, even if there was a legitimate need for the Practitioner Defendants to supplement the clinical interview and mental status examination portions of legitimate psychiatric diagnostic evaluations with psychiatric testing in order to formulate a diagnosis and treatment plan for an individual Insured – which there was not – as noted above, simple self-administered or self-scored inventories, screening tests, or other similar tests are considered part of the psychiatric diagnostic evaluation service and are not separately payable as psychiatric testing.

81.    In actuality, the tests were merely a handful of pre-printed checklists and inventories that automatically were distributed to the Insureds by the front-desk receptionists at the Clinics pursuant to the unlawful referral relationships with the Clinics. The Insureds were then invited to check off the psychological symptoms they purportedly were experiencing.  None of the Practitioner Defendants, including Dr. Gepp herself, engaged in any independent assessment of any Insured's discrete symptoms or presentation before the Insureds were handed the psychological tests. The charges for the psychological testing therefore, was fraudulent inasmuch as the testing was performed, to the extent it was performed at all, pursuant to a predetermined treatment protocol.

82.    In keeping with this predetermined treatment protocol, an identical battery of psychological tests was provided to virtually every Insured, without regard for their individual circumstances or presentation. Specifically, in virtually every case where a diagnostic interview was conducted, the Social Worker Defendants purported to provide virtually every Insured with the following psychological tests:

(i)    Short Blessed Test ("SBT") – a six item questionnaire used to evaluate symptoms of dementia. A SBT typically takes ten to twelve (10-12) minutes to administer;

(ii)   Beck Anxiety Inventory ("BAI") – a twenty-one question self-report used to evaluate the symptoms of anxiety. A BAI typically takes ten to fifteen (10-15) minutes to administer;

(iii)  Beck Depression Inventory – II ("BDI") – a twenty-one question self-report used to evaluate the symptoms of depression. A BDI typically takes ten to fifteen (10-15) minutes to administer;

(iv)   Beck Hopelessness Scale ("BHS") – a set of 10-20 questions that the patient answers true/false to determine their mental state with regards to thought about future, motivation and expectations. A BHS typically takes ten to fifteen (10-15) minutes to administer;

     (v)     Pain Disability Index ("PDI") – a two-page self-report or interview used to assess the severity of and the impact of pain on daily functions. A PSI typically takes approximately five (5) minutes to administer; and

     (vi)    Posttraumatic Stress Disorder Checklist for DSM-5 ("PCL-5") – a set of twenty self-report questions used to evaluates symptoms of post-traumatic stress disorder. A PCL-5 typically takes approximately five to ten (5-10) minutes to administer.

83.     Furthermore, the Defendants' charges for the psychological testing were fraudulent because, notwithstanding the Defendants' misrepresentations that the tests virtually always took four (4) hours to perform, the tests generally never took more than seventy-two minutes to administer, score, and interpret, to the extent that they were performed in the first instance.

84.     The Defendants' charges for the psychological testing routinely misrepresented that the Social Worker Defendants who purportedly administered the testing prepared genuine, written reports interpreting the test results. Specifically, according to the New York Workers' Compensation Fee Schedule (the "Fee Schedule"), which is applicable to claims for No-Fault Benefits, the use of CPT codes 96101 represents that the treating psychologist has prepared a written report interpreting the psychological test results.

85.     That never happened.  Rather, the Social Worker Defendants simply cobbled the psychological testing reports together using boilerplate language from preexisting reports.  In fact, virtually every psychological testing report submitted by the Defendants in support of the Gepp Entities billing contained language that was duplicated across Insureds' reports. Only the Insureds' respective background information and "test results and interpretation" scores were unique to any particular patient. In particular, and as set forth above, virtually every psychological testing report resulted in a verbatim recommendation for psychotherapy, as well as a verbatim description of what that course of psychotherapy would entail:

> Recommendations: (Name of Insured) should receive Supportive Psychotherapy through Cognitive-Behavioral Therapy and/or Biofeedback. Treatment should be provided at least once a week to cope with disability and regulate pain level; or
>
> Recommendations: Patient should complete the neuropsychological evaluation. Patient should start psychotherapy at least once a week in order to achieve tools to cope with disabilities. Patient should receive cognitive remediation as needed.

A representative sample of the Defendants' fraudulent psychological test reports containing this identical, boilerplate language is annexed hereto as Exhibit "4".

86.    Virtually every boilerplate "psychological test report" generated by the Practitioner Defendants concluded with a false, predetermined "diagnosis" as the result of "emotional behavioral problems" incurred during an automobile accident. The Insureds received these phony "diagnoses" regardless of their individual circumstances or unique presentation. In actuality, the vast majority of Insureds did not suffer from any other legitimate psychological problems as the result of the minor automobile accidents they supposedly experienced.

87.    In the majority of claims, the Insured allegedly was involved in a very minor accident involving a low-speed rear-end collision or a side-swipe. Most of the Insureds did not go to the hospital following the alleged accidents, and the minority of Insureds who did go to the hospital was, in virtually every case, briefly observed in the emergency room and home after an hour or two. Many Insureds notably reported that they experienced no symptoms. These trivial "fender-benders" did not induce any form of "adjustment disorder" in the Insureds who purportedly experienced them.

88.    The Defendants' purported use of psychological tests, to the extent that they actually provided the tests in the first instance, stands in marked contrast to the standard of care in basic, legitimate psychological practice. For instance, under generally accepted standards and practices, a diagnostic interview examination alone should be sufficiently comprehensive to

30

address all the issues discernable from the types of self-reporting psychological tests that the Social Workers purported to provide. Psychological testing of the kind allegedly administered by the Social Worker Defendants would only be necessary when a diagnosis is not evident from a diagnostic interview psychological testing would be necessary to yield relevant additional clinical data beyond that obtained through the diagnostic interview – a circumstance that cannot be established prior to the administration of the diagnostic interview.  In fact, the Fee schedule acknowledges that "Psychological testing should not be used routinely."

89.    Additionally, Gepp Psych purportedly performed and billed GEICO for a "Montreal Cognitive Assessment" for four units using CPT code 96116-1B, for the amount of $1,296.28. A Montreal Cognitive Assessment is test used to screen for Alzheimer's disease and age-related mental decline. For example:

(i)    On March 11, 2021, an Insured named MC was purportedly involved in a motor vehicle accident. On April 2, 2021, MC purportedly underwent an initial evaluation with Mitchell at the Pitkin Avenue Clinic. The notes from the purported evaluation note that MC did not report any symptoms. Despite this, GEICO received billing from Gepp Psych for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing by psych/phys" under CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobiological status exam" under CPT code 96117-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" under CPT code 96118-1B (2 units), with a charge of $700.22. GEICO then received billing from GEICO for additional testing purportedly performed on April 23, 2021, for the following: (i) "psychotherapy, 45 minutes with patient" under CPT code 9034 (1 unit), with a charge of $165.94; and (ii) "Montreal cognitive assessment" under CPT code 96116-1B, with a charge of $1,296.28.

(ii)    On March 1, 2021, an Insured named LD was purportedly involved a motor vehicle accident. On March 9, 2021, LD purportedly underwent an initial evaluation with Hasanovic at the clinic located at 1894 Eastchester Road, Bronx, New York (the "Eastchester Road Clinic"). The notes from the purported evaluation reflect that LD reported his symptoms to include "feeling that most people cannot be trusted." GEICO then received billing from Gepp Psych for the following: (i)

"psychiatric diagnostic evaluation" under CPT code 90791-1B (1 unit), with a charge of $305.73; (ii) "psychological testing by psych/phys" under CPT code 96101-1B (4 units), with a charge of $1,160.48; (iii) "neurobiological status exam" under CPT code 96117-1B (1 unit), with a charge of $324.07; and (iv) "neuropsychological testing by psych/phys" under CPT code 96118-1B (2 units), with a charge of $700.22. GEICO then received billing for additional testing purportedly performed on June 15, 2021 for the following: (i) "psychotherapy, 45 minutes with patient" under CPT code 9034 (1 unit), with a charge of $165.94; and (ii) "Montreal cognitive assessment" under CPT code 96116-1B, with a charge of $1,296.28.

(iii)    On December 26, 2020, an Insured named KA was purportedly involved in a motor vehicle accident. On March 11, 2021, KA purportedly underwent an initial evaluation with an unknown testing provider at the clinic located at 152-08 Rockaway Boulevard, Jamaica, New York (the "152 Rockaway Boulevard Clinic"). The notes from the purported evaluation reflect that KA reported his symptoms to include "nervousness or shakiness inside…". GEICO then received billing from Gepp Psych for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 (1 unit), with a charge of $254.78; (ii) "neurobehavioral status exam" under CPT code 96116 (1 unit), with a charge of $270.06; (iii) "psychological testing by psych/phys" under CPT code 96101 (4 units), with a charge of $967.08; and (iv) "neuropsychological test by psych/phys" under CPT code 96118 (2 units), with a charge of $583.52. GEICO then received billing for additional testing purportedly performed on May 12, 2021 for the following: (i) "psychotherapy, 45 minutes with patient" under CPT code 9034 (1 unit), with a charge of $165.94; and (ii) "Montreal cognitive assessment" under CPT code 96116-1B, with a charge of $1,296.28.

(iv)    On February 2, 2021, an Insured named SL was purportedly involved in a motor vehicle accident. On March 11, 2021, SL purportedly underwent an initial evaluation with an unknown testing provider at the 152 Rockaway Boulevard Clinic. The notes from the purported evaluation reflect that SL reported his symptoms to include "nervousness or shakiness inside…". GEICO then received billing from Gepp Psych for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 (1 unit), with a charge of $254.78; (ii) "neurobehavioral status exam" under CPT code 96116 (1 unit), with a charge of $270.06; (iii) "psychological testing by psych/phys" under CPT code 96101 (4 units), with a charge of $967.08; and (iv) "neuropsychological test by psych/phys" under CPT code 96118 (2 units), with a charge of $583.52. GEICO then received billing for additional testing purportedly performed on April 21, 2021 for the following: (i) "psychotherapy, 45 minutes with patient" under CPT code 9034 (1 unit), with a charge of

$165.94; and (ii) "Montreal cognitive assessment" under CPT code 96116-1B, with a charge of $1,296.28.

(v)     On February 8, 2021, an Insured named FS was purportedly involved in a motor vehicle accident. On March 17, 2021, FS purportedly underwent an initial evaluation by an unknown testing provider at the clinic located at 3910 Church Avenue, Brooklyn, New York (the "Church Avenue Clinic"). The notes from the purported evaluation reflect that FS reported his symptoms to include: "nervousness or shakiness inside…". GEICO then received billing from Gepp Psych for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 (1 unit), with a charge of $254.78; (ii) "neurobehavioral status exam" under CPT code 96116 (1 unit), with a charge of $270.06; (iii) "psychological testing by psych/phys" under CPT code 96101 (4 units), with a charge of $967.08; and (iv) "neuropsychological test by psych/phys" under CPT code 96118 (2 units), with a charge of $583.52. GEICO then received billing for additional testing purportedly performed on April 22, 2021 for the following: (i) "psychotherapy, 45 minutes with patient" under CPT code 9034 (1 unit), with a charge of $165.94; and (ii) "Montreal cognitive assessment" under CPT code 96116-1B, with a charge of $1,296.28.

90.     None of the Social Workers or any other mental health professional ever legitimately reviewed the results of the psychological testing or legitimately created or altered any Insured's treatment plan based upon the results of the testing.  Indeed, as set forth above, regardless of any individual Insureds purported test scores, every Insured received the same boilerplate treatment plan, and a fraction of the Insureds actually received any follow up psychological treatment and care.

**D.     Fraudulent Misrepresentations Regarding the Identity of the Persons Performing the Fraudulent Services and Billing for Over 24 Hours on a Single Day**

91.     In order to obtain payment for the Fraudulent Services, Dr. Gepp, the Gepp Entities, and John Doe Defendants "1" through "10" falsely represented the identities of the mental health professionals who performed the services that were billed through the Gepp Entities to GEICO. In fact, in every NF-3 submitted to GEICO, Dr. Gepp, the Gepp Entities and John Doe Defendants

"1" through "10" intentionally misrepresented that Dr. Gepp was the actual provider of the services.

92.     In fact, Dr. Gepp virtually never performed or directly supervised the vast majority of massive amount of mental health testing and services that were allegedly provided to GEICO Insureds and billed to GEICO.  Rather, virtually all the mental health testing and services that were billed to GEICO were performed by the Social Worker Defendants without any legitimate supervision or oversight by Dr. Gepp or any other licensed psychologist.

93.     Pursuant to New York Education Law §7605 Sect. 3 (13), an individual with a Master's level degree in psychology or its equivalent can practice psychology, including performing psychological testing and counseling, so long as that individual is "working under the supervision of a licensed psychologist." The Social Worker Defendants were not licensed psychologists, but rather held Master's level degrees in social work (at best).  As a result, the No-Fault Law prohibited the Gepp Entities from recovering of no-fault benefits from the services allegedly performed by the unsupervised Social Worker Defendants.

94.     In fact, Dr. Gepp, while the only individual who is qualified to perform psychological testing without supervision, was not the provider who performed the testing for more than for 96% of the Insureds purportedly treated by the Gepp Entities.

95.     Dr. Gepp, the Gepp Entities and John Doe Defendants "1" through "10" were well aware of the fact that the Gepp Entities could not legitimately bill or recover for services provided by unsupervised mental health providers who were not licensed psychologists such as the Social Worker Defendants. As such, they falsely listed Dr. Gepp as the treating provider on every bill submitted to GEICO, and affixed photocopies of Dr. Gepp's signatures to both bills and medical

notes, that were often undated, to misrepresent that Dr. Gepp either performed or supervised the services purportedly provided.

96.      Additionally, Dr. Gepp, the Gepp Entities and John Doe Defendants "1" through "10" billed GEICO for more than 2,500 hours of psychological testing allegedly performed between October 19, 2020 and July 19, 2021, and for more than 30 hours per day on multiple individual days. The following are representative examples:

| Date of Service | Total Hours of Testing Billed to GEICO Using CPT Code 96101 |
|---|---|
| 12/1/2020 | 48 |
| 12/16/2020 | 44 |
| 4/2/2021 | 44 |
| 2/16/2021 | 42 |
| 11/25/2020 | 40 |
| 1/21/2021 | 40 |
| 3/24/2021 | 40 |
| 3/31/2021 | 40 |
| 3/17/2021 | 37 |
| 12/7/2020 | 36 |
| 1/26/2021 | 36 |
| 11/16/2020 | 32 |
| 12/10/2020 | 32 |
| 12/15/2020 | 32 |
| 2/25/2021 | 32 |
| 6/18/2021 | 32 |
| 6/30/2021 | 32 |

97.      In addition to billing GEICO for over twenty-four (24) hours of testing on a single date on multiple occasions, there are over twenty-five (25) days for which the Gepp Entities submitted bills to GEICO where the services purportedly provided to Insureds by a single provider for a single date of service exceeded 24 hours, including the following dates:

| Date of Service | Actual Provider | Hours Billed to GEICO |
|---|---|---|
| 11/25/2020 | Matos | 70 |
| 11/16/2020 | Matos | 53.75 |
| 12/7/2020 | Matos | 53 |

| 12/1/2020 | Matos | 49 |
| 11/5/2020 | Matos | 45 |
| 1/18/2021 | Paulin | 42 |
| 1/21/2021 | Paulin | 40 |
| 11/18/2020 | Matos | 40 |
| 12/10/2020 | Paulin | 39 |
| 11/12/2020 | Matos | 38 |
| 11/9/2020 | Matos | 34 |
| 11/20/2020 | Paulin | 34 |
| 12/1/2020 | Paulin | 33 |
| 11/17/2020 | Matos | 33 |
| 11/11/2020 | Matos | 33 |
| 4/6/2021 | Palmer | 32 |
| 11/10/2020 | Matos | 31 |
| 11/3/2020 | Matos | 30 |
| 12/3/2020 | Paulin | 28 |
| 12/16/2020 | Matos | 28 |
| 11/23/2020 | Matos | 27 |
| 10/21/2020 | Matos | 26 |
| 12/15/2020 | Matos | 26 |
| 10/30/2020 | Matos | 26 |
| 11/19/2020 | Matos | 26 |
| 6/3/2021 | Mitchell | 26 |
| 3/17/2021 | Dr. Gepp | 25 |
| 1/6/2021 | Paulin | 25 |
| 1/22/2021 | Paulin | 25 |

98.     Not only is it impossible for a single provider to perform over twenty-four hours of services in one day, but it is also impossible that Dr. Gepp supervised the Social Worker Defendants who purportedly performed over twenty-four hours of services during a single date, despite the fact her signature appears on virtually every bill submitted to GEICO.

99.     The number of hours, both in the aggregate and on a per day basis goes well beyond that which Dr. Gepp or any group of licensed psychologists could have performed and/or supervised. What makes this even more absurd is that the fact that the fraudulent billing for testing and services that Dr. Gepp, the Gepp Entities and John Doe Defendants "1" through "10" submitted or caused to be submitted through the Gepp Entities constituted only a fraction of the total fraudulent billing for psychological evaluations, testing, and services that were submitted through the Gepp Entities to all of the automobile insurers in the New York automobile insurance market. The charts identified above only address billing from GEICO, and does not include other

automobile insurers that would make the hours 1.5 to 2.5 greater if similar to billing received by GEICO.

**E.     The Fraudulent Use of the "1B" Modifier in Billing by Gepp Psych**

100.    As Dr. Gepp and John Doe Defendants "1-10" transitioned from submitting bills for purported services under the Gepp Sole Proprietorship to Gepp Psych, the fraudulent scheme evolved to include the submission of claims to GEICO including a "1B" modifier, in order to further maximize the fraudulent reimbursement that they could extract from GEICO.

101.    Pursuant to the CPT codes set forth in the NY Fee Schedule, a "1B" modifier, "provides a 20 percent reimbursement increase for providers with the following WCB [Worker's Compensation Board] assigned provider rating codes: PN-P (Psychiatry), PN-ADP (Addiction Psychiatry), PN-PM (Pain Management), and PSY (Psychology)."

102.    As a part of the fraudulent scheme, Dr. Gepp and John Doe Defendants "1-10" increased the charges submitted to GEICO as they transitioned to billing using Gepp Psych by utilizing the "1B" modifier, resulting in the following charge increases, despite the fact that virtually every provider remained the same:

| CPT Code | Price Charged to GEICO by the Gepp Sole Proprietorship | Price Charged to GEICO by Gepp Psych using "1B" Modifier |
|---|---|---|
| 96101 | $967.08 | $1,160.48 |
| 90791 | $254.78 | $305.73 |
| 96116 | $270.06 | $324.07 |
| 96118 | $583.52 | $700.22 |

103.    Gepp Psych's utilization of the "1B" modifier in bills submitted to GEICO allowed the Defendants' to increase the already fraudulent charges by 20% across the battery of Fraudulent

Charges, furthering their fraudulent scheme to extract payments from GEICO to which they were never entitled.

**F.     The Fraudulent Billing for Treatment and Testing Never Provided by the Gepp Entities**

104.    Part of the Defendant's fraudulent scheme further included billing on behalf of Insureds who never received any testing or treatment from a provider purportedly associated with the Gepp Entities.

105.    On several instances where GEICO was billed for testing and services purported provided to Insureds by the Gepp Entities, the Insureds reported to GEICO that they never received any treatment or testing by the Gepp Entities. For example:

> (i)      An Insured named Joscelyn Maizonet was interviewed by a GEICO investigator. JM reported that she never told anyone that she needed to see a psychologist and refused psychological treatment. Despite this, GEICO received billing from Gepp Psych on behalf of JM for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 (1 unit); (ii) "psychological testing by psych/phys" under CPT code 96101 (4 units); (iii) "neurobiological status exam" under CPT code 96117 (1 unit); and (iv) "neuropsychological testing by psych/phys" under CPT code 96118 (2 units).

> (ii)     An Insured named Shawn Barrera was interviewed by a GEICO investigator. SB reported that he did not receive any psychological treatment as a result of the motor vehicle accident that he was involved in and did not see a psychologist or social worker. Despite this, GEICO received billing from Gepp Psych on behalf of SB for two separate dates of service. The first was for April 13, 2021 for the following charges: (i) "psychiatric diagnostic evaluation" under CPT code 90791 (1 unit); and (ii) "psychological testing by psych/phys" under CPT code 96101 (4 units). The second bill was for June 15, 2021 for the following charge: "psychotherapy w/ patient 45 minutes" under code 9034 (1 unit).

> (iii)    An Insured named Gina Jacobs was interviewed by a GEICO investigator. GJ reported that she never told anyone that she needed to see a psychologist, nor was she seen by a psychologist. Despite this, GEICO received billing from Gepp Psych on behalf of GJ for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 (1 unit); (ii) "psychological testing by psych/phys" under CPT code 96101 (4 units); (ii)

"neuropsychological testing by psych/phys" under CPT code 96118 (1 unit); and (iv) "neuropsychological testing by psych/phys" under CPT code 96118 (2 units).

(iv)     An Insured named Jean Thelusmond was interviewed by a GEICO investigator. JT reported that he did not receive any psychological treatment. Despite this, GEICO received billing from Gepp Psych on behalf of JT for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 (1 unit); (ii) "psychological testing by psych/phys" under CPT code 96101 (4 units); (iii) "neurobiological status exam" under CPT code 96117 (1 unit); and (iv) "neuropsychological testing by psych/phys" under CPT code 96118 (2 units).

(v)      An Insured named Gregory Cook was interviewed by a GEICO investigator. GC reported that he did not request nor receive any psychological treatment throughout his treatment at the Pitkin Avenue Clinic. Despite this, GEICO received billing from Gepp Psych on behalf of GC for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 (1 unit); (ii) "psychological testing by psych/phys" under CPT code 96101 (4 units); (iii) "neurobiological status exam" under CPT code 96117 (1 unit); and (iv) "neuropsychological testing by psych/phys" under CPT code 96118 (2 units).

(vi)     An Insured named Victor Clarke was interviewed by a GEICO investigator. VC reported that he never met with a psychologist or mental counselor throughout his treatment at the Eastchester Road Clinic. Despite this, GEICO received billing from the Gepp Sole Proprietorship on behalf of VC for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 (1 unit); (ii) "psychological testing by psych/phys" under CPT code 96101 (4 units); (iii) "neurobiological status exam" under CPT code 96117 (1 unit); and (iv) "neuropsychological testing by psych/phys" under CPT code 96118 (2 units).

(vii)    An Insured named Abdul Amazon was interviewed by a GEICO investigator. AA reported that he never met with a psychologist or mental health counselor. Despite this, GEICO received billing from the Gepp Sole Proprietorship on behalf of AA for the following: (i) "psychiatric diagnostic evaluation" under CPT code 90791 (1 unit); (ii) "psychological testing by psych/phys" under CPT code 96101 (4 units); (iii) "neurobiological status exam" under CPT code 96117 (1 unit); and (iv) "neuropsychological testing by psych/phys" under CPT code 96118 (2 units).

### III. The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

106.    To support their fraudulent charges, Dr. Gepp, the Gepp Entities and John Doe Defendants "1" through "10" systematically submitted or caused to be submitted hundreds of NF-3 forms, reports through the Gepp Entities seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

107.    The NF-3 forms, reports, assignment of benefits and other documents submitted to GEICO by and on behalf of Dr. Gepp, Gepp Sole Proprietorship, Gepp Psych and/or John Doe Defendants "1" through "10" were false and misleading in the following material respects:

(i)     The NF-3 forms and other supporting documentation submitted to GEICO uniformly misrepresented that Dr. Gepp had performed the Fraudulent Services and that her name, license and tax identification numbers of the Gepp Entities were being legitimately used to bill for the Fraudulent Services, when in fact they were misappropriated and unlawfully used to bill for and collect money from GEICO for the Fraudulent Services;

(ii)    The NF-3 forms and other supporting documentation submitted to GEICO uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided;

(iii)   The NF-3 forms and other supporting documentation submitted to GEICO uniformly fraudulently concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback arrangements amongst the Defendants and others; and

(iv)    The NF-3 forms and other supporting documentation submitted by, and on behalf of, the Defendants uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 despite the fact that the services were provided by unlicensed individuals not employed by the Gepp Entities.

### IV. Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

108.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

40

109.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying scheme and went to great lengths to accomplish this concealment.

110.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Dr. Gepp in the performance of the Fraudulent Services.

111.    Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

112.    Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed – to the extent they were performed at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services.

113.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,100,000.00 based upon the fraudulent charges.

114.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against Gepp Sole Proprietorship and Gepp Psych**
**(Declaratory Relief under 28 U.S.C. §§2201 and 2202)**

115.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 114 above.

116.    There is an actual case and controversy between GEICO and Gepp Sole Proprietorship, and Gepp Psych, regarding more than $320,000.00 in pending billing submitted through Gepp Sole Proprietorship and Gepp Psych.

117.    Gepp Sole Proprietorship and Gepp Psych have no right to receive payment for any pending bills submitted to GEICO because the psychological services that have been billed through Gepp Sole Proprietorship and Gepp Psych were performed – to the extent that they are performed at all – pursuant to improper financial arrangements between the Defendants and the Clinics/Referral Sources.

118.    Gepp Sole Proprietorship and Gepp Psych have no right to receive payment for any pending bills submitted to GEICO because the psychological services that are billed through Gepp Sole Proprietorship and Gepp Psych were not necessary and were performed – to the extent that they are performed at all – pursuant to predetermined protocols designed to enrich the Defendants.

119.    Gepp Sole Proprietorship and Gepp Psych have no right to receive payment for any pending bills submitted to GEICO because the psychological services that were billed through MWaldman Corp, MW Psych, and Integrative Psych in many cases were not provided in the first instance.

120.     Gepp Sole Proprietorship and Gepp Psych have no right to receive payment for any pending bills submitted to GEICO because the psychological services that are billed through Gepp Sole Proprietorship and Gepp Psych in many cases were provided by unsupervised MSWs, in contravention of New York law.

121.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)      Gepp Sole Proprietorship and Gepp Psych have no right to receive payment for any pending bills submitted to GEICO through Gepp Sole Proprietorship and Gepp Psych because the Fraudulent Services were unnecessary and were performed – to the extent that they are performed at all – pursuant to improper financial arrangements between the Defendants and the Clinics/Referral Sources;

(ii)     Gepp Sole Proprietorship and Gepp Psych have no right to receive payment for any pending bills submitted to GEICO through Gepp Sole Proprietorship and Gepp Psych because the Fraudulent Services were unnecessary and were performed – to the extent that they are performed at all – pursuant to predetermined protocols that maximized the charges to GEICO;

(iii)    Gepp Sole Proprietorship and Gepp Psych have no right to receive payment for any pending bills submitted to GEICO through Gepp Sole Proprietorship and Gepp Psych because, in many cases, the Fraudulent Services were not provided in the first instance; and

(iv)     Gepp Sole Proprietorship and Gepp Psych have no right to receive payment for any pending bills submitted to GEICO through Gepp Sole Proprietorship and Gepp Psych because the Fraudulent Services were in many cases provided by unsupervised MSWs, in contravention of New York law.

## SECOND CAUSE OF ACTION
### Against Dr. Gepp, and John Doe Defendants "1" through "10"
### (Violation of RICO, 18 U.S.C. § 1962(c))

122.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 121 above.

123.     The Gepp Sole Proprietorship is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

124.    Dr. Gepp and John Doe Defendants "1" through "10" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Gepp Sole Proprietorship's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that the Gepp Sole Proprietorship was not eligible to receive under the New York no-fault insurance law because: (i) the billed-for-services were the result of an unlawful referral and kickback scheme, (ii) the billed-for-services were not psychologically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; and (iv) the billed-for services were never performed by a licensed psychologist but rather, performed by unsupervised MSWs, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

125.    The Gepp Sole Proprietorship's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Gepp and John Doe Defendants "1" through "10" operated the Gepp Sole Proprietorship, insofar as the Gepp Sole Proprietorship is not engaged in a legitimate psychology practice and acts of mail fraud therefore are essential for the Gepp Sole Proprietorship to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Dr. Gepp and John Doe Defendants "1" through "10" continue to be involved in similar fraudulent

schemes involving GEICO and other New York automobile insurers and continue to attempt to collect on the fraudulent billing submitted through the Gepp Sole Proprietorship to the present day.

126.     The Gepp Sole Proprietorship has been and continues to be engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing. These inherently unlawful acts are taken through the Gepp Sole Proprietorship in pursuit of inherently unlawful goals – namely, the theft of money from New York automobile insurers through fraudulent no-fault billing.

127.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $468,000.00 pursuant to the fraudulent bills submitted through the Gepp Sole Proprietorship.

128.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Dr. Gepp, John Doe Defendants "1" through "10"**
**and the Social Worker Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

129.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 128 above.

130.     The Gepp Sole Proprietorship is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

131.     Dr. Gepp, John Doe Defendants "1" through "10" and the Social Worker Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Gepp Sole Proprietorship's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C.

§ 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that the Gepp Sole Proprietorship was not entitled to receive under the New York no-fault laws because: (i) the billed-for-services were the result of an unlawful referral and kickback scheme; (ii) the billed-for-services were not psychologically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; and (iv) the billed-for services were never performed by a licensed psychologist but rather, performed by unsupervised MSWs, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

132. Dr. Gepp, John Doe Defendants "1" through "10" and the Social Worker Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

133. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $468,000.00 pursuant to the fraudulent bills submitted through the Gepp Sole Proprietorship.

134. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against the Gepp Sole Proprietorship, Dr. Gepp and John Doe Defendants "1" through "10"
### (Common Law Fraud)

135.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 134 above.

136.    Dr. Gepp, Gepp Sole Proprietorship and John Doe Defendants "1" through "10" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of the Gepp Sole Proprietorship's submission of hundreds of fraudulent charges to GEICO seeking payment for the Fraudulent Services.

137.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)     In every claim, the representation that the services were actually provided when in fact they were not;

(ii)    In every claim, the representation that the psychological services were eligible for payment, when in fact they were not because they were performed pursuant to illegal kickback arrangements amongst the Defendants and others;

(iii)   In every claim, the representation that the psychological services were provided by Dr. Gepp, when in fact the services were provided by unsupervised MSWs and other unlicensed persons; and

(iv)    In every claim, the representation that the psychological services were medically necessary when, in fact they were not because they performed and billed pursuant to fraudulent predetermined protocols.

138.    Dr. Gepp, Gepp Sole Proprietorship and John Doe Defendants "1" through "10" intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the Gepp Sole Proprietorship that were not compensable under New York no-fault insurance laws.

139.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $468,000.00 pursuant to the fraudulent bills submitted by Dr. Gepp, the Gepp Sole Proprietorship and John Doe Defendants "1" through "10" through the Gepp Sole Proprietorship.

140.    The extensive fraudulent conduct by Dr. Gepp the Gepp Sole Proprietorship and John Doe Defendants "1" through "10" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

141.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against the Social Worker Defendants**
**(Aiding and Abetting Fraud)**

142.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 134 above.

143.    As set forth herein, the Social Worker Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Dr. Gepp and John Doe Defendants "1" through "10" using the Gepp Sole Proprietorship.

144.    The conduct of the Social Worker Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of the Social Worker Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Dr. Gepp and John Doe Defendants "1" through "10" to obtain payment from GEICO and from other insurers using the Gepp Sole Proprietorship.

145.    The Social Worker Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to the Gepp Sole Proprietorship for psychologically unnecessary, unlawful, or otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

146.    The conduct of the Social Worker Defendants caused GEICO to pay more than $468,000.00 pursuant to the fraudulent bills submitted through the Gepp Sole Proprietorship.

147.    The Social Worker Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

148.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SIXTH CAUSE OF ACTION
**Against All Defendants**
**(Unjust Enrichment)**

149.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 148 above.

150.    As set forth above, Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

151.    When GEICO paid the bills and charges submitted by or on behalf of the Gepp Sole Proprietorship for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

152.    Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

153. Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

154. By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $468,000.00.

**SEVENTH CAUSE OF ACTION**
**Against Dr. Gepp and John Doe Defendants "1" through "10"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

155. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 154 above.

156. Gepp Psych is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

157. Dr. Gepp and John Doe Defendants "1" through "10" knowingly have conducted and/or participated, directly or indirectly, in the conduct of Gepp Psych's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that Gepp Psych was not eligible to receive under the New York no-fault insurance law because: (i) the billed-for-services were the result of an unlawful referral and kickback scheme; (ii) the billed-for-services were not psychologically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; and (iv) the billed-for services were never performed by a licensed psychologist but rather, performed by unsupervised MSWs, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are

described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

158.   Gepp Psych's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in Dr. Gepp and John Doe Defendants "1" through "10" operated Gepp Psych, insofar as Gepp Psych is not engaged in a legitimate psychology practice and acts of mail fraud therefore are essential for Gepp Psych to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Dr. Gepp and John Doe Defendants "1" through "10" continue to be involved in similar fraudulent schemes involving GEICO and other New York automobile insurers and continue to attempt to collect on the fraudulent billing submitted through the Gepp Sole Proprietorship to the present day.

159.   Gepp Psych has been and continues to be engaged in inherently unlawful acts, inasmuch as it continues to attempt collection on fraudulent billing. These inherently unlawful acts are taken through Gepp Psych in pursuit of inherently unlawful goals – namely, the theft of money from New York automobile insurers through fraudulent no-fault billing.

160.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $666,000.00 pursuant to the fraudulent bills submitted through Gepp Psych.

161.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
**Against Dr. Gepp, John Doe Defendants "1" through "10"
and the Social Worker Defendants
(Violation of RICO, 18 U.S.C. § 1962(d))**

162.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 161 above.

163.    Gepp Psych is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

164.    Dr. Gepp, John Doe Defendants "1" through "10" and the Social Worker Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Gepp Psych's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis seeking payments that Gepp Psych was not entitled to receive under the New York no-fault laws because: (i) the billed-for-services were the result of an unlawful referral and kickback scheme; (ii) the billed-for-services were not psychologically necessary and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; and (iv) the billed-for services were never performed by a licensed psychologist but rather, performed by unsupervised MSWs, in contravention of New York law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

165.    Dr. Gepp, John Doe Defendants "1" through "10" and the Social Worker Defendants knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

166.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid more than $666,000.00 pursuant to the fraudulent bills submitted through Gepp Psych.

167.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Gepp Psych, Dr. Gepp and John Doe Defendants "1" through "10"
### (Common Law Fraud)

168.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 167 above.

169.    Dr. Gepp and John Doe Defendants "1" through "10" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of Gepp Psych's submission of hundreds of fraudulent charges to GEICO seeking payment for the Fraudulent Services.

170.    The false and fraudulent statements of material fact and acts of fraudulent concealment include:

(i)    In every claim, the representation that the services were actually provided when in fact they were not;

(ii)    In every claim, the representation that the psychological services were eligible for payment, when in fact they were not because they were performed pursuant to illegal kickback arrangements amongst the Defendants and others;

(iii)    In every claim, the representation that the psychological services were provided by Dr. Gepp, when in fact the services were provided by unsupervised MSWs and other unlicensed persons; and

(iv)    In every claim, the representation that the psychological services were medically necessary when, in fact they were not because they performed and billed pursuant to fraudulent predetermined protocols.

171.    Dr. Gepp and John Doe Defendants "1" through "10" intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Gepp Psych that were not compensable under New York no-fault insurance laws.

172.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid more than $666,000.00 pursuant to the fraudulent bills submitted by Dr. Gepp and John Doe Defendants "1" through "10" through Gepp Psych.

173.    The extensive fraudulent conduct by Dr. Gepp and John Doe Defendants "1" through "10" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

174.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**Tenth CAUSE OF ACTION**
**Against the Social Worker Defendants**
**(Aiding and Abetting Fraud)**

175.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 174 above.

176.    As set forth herein, the Social Worker Defendants knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Dr. Gepp and John Doe Defendants "1" through "10" using Gepp Psych.

177.    The conduct of the Social Worker Defendants in furtherance of the fraudulent scheme was significant and material. The conduct of the Social Worker Defendants was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for Dr. Gepp and John Doe Defendants "1" through "10" to obtain payment from GEICO and from other insurers using Gepp Psych.

178.    The Social Worker Defendants aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to Gepp Psych for psychologically unnecessary, unlawful, or otherwise non-reimbursable Fraudulent Services because they sought to continue profiting through the fraudulent scheme.

179.    The conduct of the Social Worker Defendants caused GEICO to pay more than $666,000.00 pursuant to the fraudulent bills submitted through Gepp Psych.

180.    The Social Worker Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

181.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**<u>ELEVENTH CAUSE OF ACTION</u>**
**Against All Defendants**
**(Unjust Enrichment)**

182.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 181 above.

183.    As set forth above, Defendants engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

184.    When GEICO paid the bills and charges submitted by or on behalf of Gepp Psych for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Defendants' improper, unlawful, and/or unjust acts.

185.    Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

186.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

187.    By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $666,000.00.

### **JURY DEMAND**

188.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the Gepp Sole Proprietorship and Gepp Psych, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Gepp Sole Proprietorship and Gepp Psych have no right to receive payment for any pending bills submitted to GEICO;

B.      On the Second Cause of Action against Dr. Gepp and John Doe Defendants "1" through "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $468,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against the Dr. Gepp, John Doe Defendants "1" through "10" and the Social Worker Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $468,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against the Gepp Sole Proprietorship, Dr. Gepp and John Doe Defendants "1" through "10", compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $468,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against the Social Worker Defendants compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $468,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against all defendants, for more than $468,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Dr. Gepp and John Doe Defendants "1" through "10", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $666,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Dr. Gepp, John Doe Defendants "1" through "10" and the Social Worker Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $666,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Ninth Cause of Action against Gepp Psych, Dr. Gepp and John Doe Defendants "1" through "10", compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $666,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper;

J.      On the Tenth Cause of Action against the Social Worker Defendants compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $666,000.00, together with punitive damages, costs, interest, and such other relief as this Court deems just and proper; and

K.      On the Eleventh Cause of Action against all defendants, for more than $666,000.00 in compensatory damages, plus costs, interest and such other and further relief as this Court deems just and proper.

Dated: May 16, 2022

RIVKIN RADLER LLP

By:   /s/ Barry I. Levy, Esq.
        Barry I. Levy, Esq.
        Michael A. Sirignano, Esq.
        Allison N. Stapleton, Esq.
        Phil Nash, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*